UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| MICHAEL E. BOSSE,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>JAQLYNN DOLAN,<br><br>　　　　　　　Defendant. | Case No. 1:21-cv-00176-DKG<br><br>**MEMORANDUM DECISION AND ORDER** |

Plaintiff Michael E. Bosse (Plaintiff) is proceeding on his Amended Complaint (Dkt. 8) against registered nurse Jaqlynn Dolan (Defendant or Dolan), a former Idaho Department of Correction (IDOC) interstate medical director. Dolan audited medical care of Idaho prisoners confined in out-of-state facilities. Plaintiff asserts that Dolan is liable for (1) Texas medical providers' failure to treat his ear infection, knee problem, wrist problem, blackout spells, and glaucoma;  (2) Arizona medical providers' failure to treat his ear infection, knee problem, wrist problem, blackout spells, and glaucoma; and (3) medical providers' failure to provide him with proper medical care after his return to an Idaho facility. *See* Dkt. 10 at 2, 5.

A court may take judicial notice of matters of public record. Fed. R. Evid. 201. A court may take judicial notice of facts from other litigations, "depend[ing] in large measure upon considerations of expediency and justice in the circumstances of the particular case," including "where the two cases represent related litigation." *Lowe v.*

**MEMORANDUM DECISION AND ORDER - 1**

*McDonald*, 221 F.2d 228, 230-31 (9th Cir. 1955); *accord, United States v. Vasquez-Guerrero*, 554 F.2d 917 (9th Cir. 1977).

## DEFENDANT'S SUMMARY JUDGMENT MOTION

### 1.  Standard of Law and Defendant's Theories of Defense

Summary judgment may be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show that the material facts are not in dispute, a party may cite the record or show that the adverse party is unable to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the parties. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

**MEMORANDUM DECISION AND ORDER - 2**

## REVIEW OF RES JUDICATA DEFENSE:
## TEXAS CLAIMS (EXCEPT WRIST AND BLACKOUT CLAIMS)

Defendant asserts that Plaintiff already adjudicated his claims of substandard medical care in an earlier Texas lawsuit, and, therefore, res judicata applies.

### 1. Standard of Law

Under federal law, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981); *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005).

### 2. Discussion

A. <u>Adjudication on the Merits</u>

Federal Rule of Civil Procedure 41(b) specifies that all dismissals with prejudice (except those for lack of jurisdiction, improper venue, or failure to join a party under Rule 19) operate as an adjudication on the merits. Fed.R.Civ.P. 41. When a pro se pleading is screened under 28 U.S.C. § 1915(e)(2), "the Court applies the same standard as that for deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)," and thus, a case dismissed with prejudice for failure to state a claim "constitutes a final judgment on the merits." *Phan v. Olive Crest*, 2022 WL 17162579, at *5 (C.D. Cal. Nov. 2, 2022), *report and recommendation adopted*, 2022 WL 17155761 (C.D. Cal. Nov. 22, 2022), *aff'd*, 2023 WL 6875420 (9th Cir. Oct. 18, 2023); *Westcott v. Moon*, 2024 WL 3379684, at *2 (N.D. Ca. 2024) (same).

On September 19, 2019, Plaintiff filed a lawsuit claiming that he received substandard medical care while he was housed in Texas beginning in October 2018. *See Bosse v. Geo Group Inc.*, Case No. 2:19-cv-00055-AM-VRG (Case 55), filed in the Western District of Texas. Case 55 was dismissed with prejudice and a final judgment was entered on September 16, 2022. *See* Exhibits to this Order, *Order of Dismissal and Judgment in a Civil Case*. The Court concludes that Case 55 is a prior final judgment on the merits for res judicata purposes.

      B.  <u>Same Parties or Privies</u>

A person is in "privity" with a litigant when both have the same interests and rights in the subject matter of a lawsuit. *In re Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997) (citation and quotation marks omitted). Privity is a "flexible concept dependent on the particular relationship between the parties in each individual set of cases...." *Tahoe–Sierra Pres. Council*, 322 F.3d at 1081–82; *see also Va. Sur. Co. v. Northrop Grumman Corp.*, 144 F.3d 1243, 1247 (9th Cir. 1998) ("It is the identity of interest that controls in determining privity, not the nominal identity of the parties." (quotation marks and citation omitted)).

The private company "GEO" operates the Eagle Pass Correctional Facility (EPCF) where Plaintiff was held. GEO had a contract with the state of Idaho to house Idaho prisoners. Plaintiff sued GEO administrative and medical staff and IDOC supervisory administrators (Mr. Higgins and Mr. Hansen) for Eighth Amendment and medical negligence violations. The inadequate supervision claims against the IDOC defendants

**MEMORANDUM DECISION AND ORDER - 4**

included allegations that their colleague, Defendant Dolan, also inadequately supervised GEO's medical care. That Dolan's work was at issue in Case 55 is clear because Plaintiff included Dolan's correspondence to him as an exhibit to his Texas complaint. *See* Exhibit to Order, *Texas Complaint*, at 15.

The Court concludes that Defendants Mr. Higgins and Mr. Hansen in the Texas suit and Dolan in this suit are privies because their interests and rights are the same: they were all IDOC supervisory administrators who were overseeing Texas medical care of Idaho prisoners. Dolan also is in privity with the GEO medical staff defendants to the extent that Dolan's liability is derivative of the GEO medical staff defendants' liability: Dolan could not have been deliberately indifferent if the GEO medical providers were not deliberately indifferent.

### C.  Same Claims or Issues

The claims in the prior lawsuit must be the same claims in the present lawsuit. *Trevino v. Gates*, 99 F.3d 911, 923 (9th Cir. 1996). The Court must consider: "(1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts." *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992) (citation omitted).

In the Texas suit, Plaintiff's claims were that the defendants "refused medical treatment to my ear & legs, neglect, giving me someone else's medication, gave me dandruff shampoo for swelling in my legs & body, still sub-standard care for my glaucoma." Exhibit to Order, Texas Complaint, at 4. His legal theories included Eighth Amendment deliberate indifference; mental and physical abuse and torture; malice; medical negligence; and gross negligence. *Id*. at 5. He underlined *deliberate indifference* in an attachment to his Texas complaint that explained that Eighth Amendment theory. *Id*. at 11.

Because Plaintiff filed a motion for a preliminary injunction in the Texas case, he was given additional opportunity to present evidence at a hearing to support the medical claims in his complaint. See Exhibit to Order, *Texas Motion for Preliminary Injunction*.

In the order of dismissal, the Texas court adjudicated the following claims: "complaints of an ear infection and how long it took to get an appointment with a specialist; that he received another prisoner's hydrocortisone cream and received a medication he claims to be allergic to but that was not noted as an allergy in his medical file; that he has suffered from an ear infection and leg swelling; that he was refused a wheelchair; that he believes he received sub-standard care for glaucoma; and that he was initially instructed to treat his leg swelling with dandruff shampoo." Exhibit to Order, *Texas Order of Dismissal*, at 8-9.

The Texas court concluded:

> It is quite evident…that the Plaintiff has received
> medical care and responses to his numerous medical requests

**MEMORANDUM DECISION AND ORDER - 6**

and that EPCF officials were not deliberately indifferent to his complaints. The Plaintiff's allegations amount to nothing more than disagreements with the treatment provided and assertions and medical negligence. The Plaintiff himself admitted at the hearing on his request for a preliminary injunction that he is receiving medical care and that his claim is for medical malpractice.

Exhibit to Order, *Texas Order of Dismissal*, at 9.

After entry of dismissal in Texas, Plaintiff attempted to persuade the court to alter its judgment so that it would not negatively affect this and other cases. The Texas court declined to do so. *See* Exhibits to Order, *Texas Motion to Reconsider* and *Order*.

In this action, Plaintiff brought Texas deliberate indifference claims arising from 2018 to August 2020, including complaints of swollen legs, blood and infection in his inner ear, denial of a wheelchair, that he had been given someone else's prescription, that he had been given dandruff shampoo for swollen legs, and that he was past due for a glaucoma examination. Dkt. 8 at 2.

The Court concludes that the *Clark* "same claims" factor is met. The IDOC supervisors, including Dolan, are entitled to rely on the fact that claims against the GEO medical providers and derivative claims against the IDOC supervisory officials for Plaintiff's Texas medical care were finally resolved. Their right to finality would be impaired by another lawsuit. Substantially the same medical evidence was presented in the two actions, including the Dolan letter, all of Plaintiff's written complaints to GEO and the IDOC, and Plaintiff's medical records. The two suits are about an identical

right—Eighth Amendment medical care. The claims arise out of the same transactional nucleus of facts and from the same time period—2018 to August 2020.

### 3. Conclusion

The Court concludes that the Texas court's decision (Case 55, Dkt. 59) constitutes a final judgment on the merits of the same claims raised under the same legal theories between the same plaintiff and defendants who are in privity with each other. If Plaintiff disagreed with the Texas court's decision, he had opportunity to appeal it. He did not.

Accordingly, Plaintiff is precluded from pursuing the Texas claims in this action, including his claims that he is suffering from continuing injuries as a result of the lack of care in Texas. *See* Dkt. 118, *Plaintiff's Response to Summary Judgment Motion*. The time to raise permanent injury claims was in the Texas case. The Texas judge did not enter a final order until September 16, 2022, two years after Plaintiff's transfer to Arizona. Plaintiff could have sought leave to amend if he uncovered additional facts, claims, or injuries. Res judicata applies to all related claims that could have been brought, not just those that were.

Plaintiff also argues that res judicata should not apply because the Texas judge "was pissed off and said get this Idaho crap out of my court room." *Id*. at 13. But the Texas judge decided that GEO medical staff were not deliberately indifferent to Plaintiff's health; therefore, by derivation, the Idaho defendants could not have been deliberately indifferent in supervising the GEO medical staff. These Texas claims are subject to dismissal with prejudice.

## EIGHTH AMENDMENT STANDARD OF LAW

The Eighth Amendment to the United States Constitution protects prisoners from cruel and unusual punishment. To state a claim a plaintiff must show he was "incarcerated under conditions posing a substantial risk of serious harm," which is analyzed under an objective standard. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). He also must show the defendants were deliberately indifferent to his needs—analyzed under a subjective standard. *Id*. at 838. "Deliberate indifference" exists when an "official knows of and [recklessly] disregards an excessive risk to inmate health or safety," which means that an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Medical negligence or malpractice alone will not support a claim for relief under the Eighth Amendment. *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th Cir. 1980).

A defendant can be held liable under § 1983 if she "knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A prison administrator shows deliberate indifference to a prisoner's medical needs if she "knowingly fail[s] to respond to an inmate's requests for help." *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014).

**MEMORANDUM DECISION AND ORDER - 9**

A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990).

## REVIEW OF TEXAS EIGHTH AMENDMENT CLAIMS: WRIST AND BLACKOUT CLAIMS

In Plaintiff's Amended Complaint, he vaguely asserts that medical providers failed to treat his wrist pain and blackouts at the Texas facility. Dkt. 8. These claims were not among those decided by the Texas court and are not subject to res judicata.

Plaintiff has not pointed to anything in the medical records showing that he brought these medical issues to medical providers' or Dolan's attention during his confinement in Texas. Therefore, there is no genuine dispute of material fact preventing the Court from concluding that Plaintiff was suffering from a serious medical condition as to wrist pain and blackouts at that time (the record reflects these conditions occurred much later, when he was re-housed in Idaho), or that Dolan was deliberately indifferent to any such condition during his Texas confinement. These claims are subject to summary judgment.

## REVIEW OF ARIZONA EIGHTH AMENDMENT CLAIMS

Dolan contends that, because the Arizona medical care was constitutionally adequate, she could not have been deliberately indifferent in her supervision of the care.

### 1.  Plaintiff's Medical Conditions and Claims in Context

Plaintiff developed symptoms of glaucoma in 2004 and was diagnosed by the Veteran's Administration in 2007. Dkt. 74 at 13. There is no cure for the disease, but

**MEMORANDUM DECISION AND ORDER - 10**

glaucoma patients are prescribed eye drops to lower eye pressure on the optic nerve to stop disease progression. High pressure can cause blindness. *Id*. The record reflects that Plaintiff's eye specialists generally recommended that his eye pressure be checked about every three (Dkt. 74-8 at 5) to six months (Dkt. 74-5 at 4) and that he should be tested for peripheral blindless and optic nerve damage annually.

The Court takes judicial notice that, several months before Plaintiff was transferred from Texas to Arizona, "the World Health Organization (WHO) declared COVID-19, the disease caused by the SARS-CoV-2, a pandemic."[1]

In August 2020, Plaintiff was transferred to the Saguaro Correctional Facility in Arizona. Dkt. 74-4 at 9. Plaintiff's Arizona initial intake screening form shows glaucoma/vertigo as a special health care need and a current medical complaint. *Id*.

On August 25, 2020, Plaintiff turned in a Health Services Request (HSR) form to the Arizona medical unit. *See* reference in Dkt. 74-14 at 6.

On September 1, 2020, Plaintiff saw a doctor, who renewed Plaintiff's prescriptions for glaucoma. *See* Dkt. 74-14 at 6.

On September 4, 2020, Plaintiff wrote a grievance to Arizona staff, stating: "I have glaucoma disease and will go blind if not maintained. I use eye drops for that to regulate pressure on my optical nerve, you guys will not give me my eye drops. I asked 8/25/ 26/27 28 29 30 31. I turned in medical request 8/25 that was never answered. I did see the doctor 9-1 and he said I'll have the R.X. on Wed. here it is Thurs now looking at a

---

[1] See https://www.yalemedicine.org/news/covid-timeline (accessed 12/20/2026).

major holiday…. Please medicate me as per your contract and quit trying to kill me."
Dkt. 74-14 at 6.

On September 11, 2020, Plaintiff wrote a concern form to Dolan: "Well, it has
been three weeks since my arrival @ Arizona, and they refuse to give me any eyedrops."
Dkt. 74-14 at 21.

On September 22, 2020, the Arizona medical provider requested an "optomology"
[sic] consult to test eye pressures and peripheral. Dkt 75-2 at 31.

On September 26, 2020, Plaintiff's prescription for Timolol Maleate
ophthalmology solution t was dispensed, refillable for eleven months. Dkt. 74-14 at 21.

On November 3, 2020, Plaintiff filed a concern form addressed to Dolan stating
that he had talked with her about a needed eye appointment, and it had been over a year
with no appointment. "I do realize this COVID is a major obstacle," he noted. Dkt. 75-2
at 32. The IDOC response was: "You have a pending consult, many things are delayed
due to COVID." Dkt. 75-2 at 32.

On November 8, 2020, Plaintiff filed a grievance with Idaho officials stating that
Arizona and Idaho officials refused to treat him; his last glaucoma treatment had been in
November 2019; and that the Del Rio, Texas eye doctor's advice was that he should have
been seen three months after his November 2019 eye examination. He also asked for
reading glasses. Dkt. 74-13 at 16.

On November 23, 2020, Plaintiff mailed a grievance appeal stating he had not had
glaucoma treatment for 12 months, and had not had his glasses or medication updated.

**MEMORANDUM DECISION AND ORDER - 12**

Dkt. 74-13 at 14.

On November 24, 2020, Arizona or Idaho officials responded to the grievance: "You have a pending consult. if you would like reading glasses, submit a request to be seen." Dkt. 74-13 at 17.

On February 10, 2021, Dr. Kianoush Kian checked Plaintiff's glaucoma at the Advanced Laser & Eye Center of Arizona. Dr. Kian noted: "Has been taking glaucoma drops for 12 years, but has not been given drops for the last ten days. Was stretching it and ran out yesterday. Reports on Lisinopril tablets and Timolol drops." Dkt. 75-2 at 29. A conclusion of "[n]o glaucomatous damage" was noted on the tomography. Dkt. 74-6 at 3. Dr. Kian reported: "Stable glaucoma. Need upcoming visual field. Updated glasses prescription." *Id*. at 4. Dr. Kian further concluded: "His OCT[2] does not reveal damage, so he was caught early in the course of glaucoma." Dkt. 74-6 at 10.

## 2. Discussion

A review of the medical treatment Plaintiff sought and received during his 10-month incarceration in Arizona does not show that Arizona medical providers rendered

---

[2] The Court takes judicial notice of the following definition:

> Optical coherence tomography (OCT) and optical coherence tomography angiography (OCTA) are non-invasive imaging tests. They use light waves to take cross-section pictures of your retina.
>
> With OCT, your ophthalmologist can see each of the retina's distinctive layers and the optic nerve fiber layer. This allows your ophthalmologist to map and measure their thickness and changes over time. These measurements help with diagnosis. They also guide treatment for glaucoma….

*See* https://www.aao.org/eye-health/treatments/what-is-optical-coherence-tomography (accessed 2/19/2026).

**MEMORANDUM DECISION AND ORDER - 13**

constitutionally inadequate care. His stay in Arizona was during the COVID-19 pandemic, when many health care visits were delayed as a cautionary effort to prevent spread of the virus. He arrived in August 2020 and received an annual prescription for necessary eye drops in September 2020. He was seen by an eye doctor in February 2021, and his condition was stable; his examination did not reveal damage.

Plaintiff has not shown by a competent medical opinion that his eyesight was damaged, or, if it was, that it was worsened by Dolan's or any medical provider's personal participation in Plaintiff's care.

The record does not reflect that Plaintiff contacted Dolan from Arizona about any of his other medical conditions. Dolan is entitled to summary judgment because her responses do not show that she drew an inference that her chosen course of action would result in a serious risk of harm to Plaintiff's health. The benefits of delaying non-emergency medical treatment in the United States during the COVID pandemic often outweighed the benefit of having a follow-up visit that might have caused the patient to contract COVID-19 and die.

### REVIEW OF IDAHO EIGHTH AMENDMENT CLAIMS

1.  **Overview**

Plaintiff was returned to Idaho in March or April 2021, *see* Dkt. 74-4 at 13, and he alleges that Dolan left her IDOC employment on April 1, 2021. Dkt. 79-4 at 10. Several problems are evident with Plaintiff's complaints from this time period.

Dolan did not work for IDOC after April 1, 2021, and Plaintiff's Idaho complaints

**MEMORANDUM DECISION AND ORDER - 14**

arose after April 1, 2021. Therefore, there is no causal connection between Dolan and Plaintiff's asserted injuries unless Plaintiff can show that Dolan's deliberate indifference from the Texas or Arizona time period caused the later Idaho injuries. As explained earlier, permanent injuries from the Texas confinement period must have been asserted in the Texas lawsuit. Ongoing injuries from that time period are barred by res judicata. As to the Arizona confinement, the Court explained above that Plaintiff failed to provide sufficient facts showing deliberate indifference to his medical needs; therefore, by derivation, nothing Dolan did during that time frame could have caused his ongoing injuries during his later Idaho confinement.

Dolan asserts that she was not responsible for directing Plaintiff's medical care once he arrived in Idaho, because her job was auditing out-of-state medical providers. Dkt. 70-3 at 3. To the extent that Dolan's last date of IDOC employment overlapped with Plaintiff's return to Idaho, Plaintiff has failed to show that Dolan had any personal participation in his medical care, given that the focus of her work was out-of-state prisoners' medical care. A defendant may be held liable as a supervisor under § 1983 if (1) he or she had "personal involvement in the constitutional deprivation," or (2) "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation" exists. *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) (punctuation altered and citation omitted).

Another issue is that, during the course of proceedings, Plaintiff seems to have expanded the scope of the authorized Idaho claims from only his glaucoma condition (*see*

**MEMORANDUM DECISION AND ORDER - 15**

Dkt. 10 at 2, 5) to many other conditions. Nevertheless, the Court will review all of the medical care presented in the record. In the following timeline, the Court emphasizes record references to Plaintiff's loss of vision associated with glaucoma in italics.

**2. Timeline of Idaho Complaints and Medical Care**

On April 12, 2021, Plaintiff filed an HSR asking that Corizon, the Idaho medical provider, obtain Arizona records regarding a bottom bunk permit and stating that he has not been to a glaucoma doctor in 18 months. Dkt. 74-4 at 13. He actually had seen Dr. Kian on February 10, 2021. At that time, Dr. Kian had renewed Plaintiff's eyeglasses prescription and had recommended the next eye pressure check-up be done in three months. *See* Dkt. 74-8 at 5; 74-6 at 3; Dkt. 74-6 at 10; Dkt. 75-2 at 26-27. According to Dr. Kian's recommendations, May 2021 was the earliest time frame Plaintiff should have seen an eye doctor for a check of his eye pressure. Other doctors recommend an eye pressure check every six months (Dkt. 74-5 at 4), rather than every three months.

On May 27, 2021, Plaintiff reported that he had recently returned from Arizona and had not seen an offsite optometry specialist for over 12 months. Therefore, this complaint seems to be aimed at the fact he had not been provided the recommended follow-up eye pressure check-up in May 2021.

Plaintiff asserts that the pressure in his eyes "was in the thirties, 30-32-36-34," when he returned to Idaho, causing permanent damage. Dkt. 74 at 13. He provides no record citation for these figures and no opinion by any treating doctor showing that he sustained permanent damage to his eyes *as a result of* the delayed eye pressure check-

**MEMORANDUM DECISION AND ORDER - 16**

ups. By April 2022 (*see* below), Plaintiff's pressure was within normal limits. Dkt. 74-5 at 4.

On June 1, 2021, Plaintiff filed an HSR saying, "I am due to see an eye doctor for my glaucoma, and don't have reading glasses for 1½ years now. Due to Mrs. Dolan, Texas, Arizona being liable for this issue." Dkt. 75-2 at 23. His current reading glasses had been issued in 2018. *See* Dkt. 74-6 at 26.

On June 12, 2021, Plaintiff claimed that his wrist had been broken and healed with no care from prison medical providers. Examination of the left wrist showed "ROM stable, equal strengths, no swelling, discoloration loss of sensation or function." Dkt. 75-2 at 22.

On July 12, 2021, x-rays of Plaintiff's right knee showed that his "results were within acceptable limits" and "[n]o further action is needed." Dkt. 75-2 at 17.

On August 19, 2021, Plaintiff complained of extreme vertigo and dizzy spells. He was educated about how to use the Epley Maneuver Reposition exercises to combat vertigo and will have a hearing test onsite. Dkt. 74-6 at 24.

In September 2021, Plaintiff submitted an HSR, stating he was "still using glasses from 2018"; he "need[ed] glasses after 3 years"; and he needed a glaucoma visit after 2 years." Dkt. 74-4 at 20. In addition, he had a physical therapy consult for his dizziness, and "Dix Hallpike or Epley maneuver did not improve symptoms." Dkt. 74-6 at 26.

On November 11, 2021, Plaintiff had new glasses ordered. Dkt. 74-4 at 26-27.

**MEMORANDUM DECISION AND ORDER - 17**

On November 23, 2021, Plaintiff was seen in the sick call clinic for dry, cracked skin and dizziness. He reported that he had dizzy spells for three years, had subsided to a "2-3 out of 10" and currently occurred less frequently than they did before. He had dark, dried cerumen (ear wax) in his right ear. The practitioner's assessment contained several potential causes of Plaintiff's dizziness: secondary to impacted cerumen, chronic sinusitis, permanent structure damage to inner ear from prior infection, or another cause. Several solutions were to be tested to try to diagnose the cause and eliminate the dizziness over the next 10 days. Dkt. 74-3 at 13.

On December 1, 2021, Plaintiff received his new prescription glasses and a case. Dkt. 75-2 at 11.

On December 12, 2021, Plaintiff appeared in sick call complaining of right ear pain. He "stated he was given ear drops to soften buildup, stated he had not been using ear drops." Dkt. 75-2 at 11. Plaintiff's ear was flushed out in sick call, and a large amount of black buildup flushed out. Plaintiff asked to stop the flushing because of pain. He was encouraged to use ear drops and wash his ears during showering, and he was given a box of Tylenol tablets for pain. *Id*.

On December 23, 2021, Plaintiff reported that he finished the antibiotics and had his ears irrigated, but he still has dizziness and ear pain. He checked on the status of his hearing test. Dkt. 74-3 at 19.

On January 4, 2022, Plaintiff was seen at Lifetime Optometry. He was prescribed Latanoprost and Timolol drops indefinitely, and he admitted "to poor compliance." Dkt.

**MEMORANDUM DECISION AND ORDER - 18**

74-5 at 4. His intraocular pressures were within normal limits. *Id*. The provider discussed the possible ramifications of non-compliance and recommended rechecking intraocular pressures every six months. *Id*.

On March 26, 2022, following complaints of wrist pain, Plaintiff received an x-ray.  The left wrist x-ray showed: "No fracture. No dislocation. Normal joint alignment. Normal joint spaces. Impression: Negative left wrist radiographs." Dkt 75-2 at 16.

On April 26, 2022, Plaintiff had an eye examination by Richard Murray, an optometrist at Lifetime Optometry. Dkt. 74-5 at 4. The report shows that Plaintiff's diagnosis was Primary Open Angle Glaucoma (POAG), that he was prescribed Latanoprost and Timolol indefinitely, and that he admitted to poor compliance. *Id*. Findings included *superior vision field loss consistent with advancing glaucoma, thinning retina nerve fiber layer*, and normal intraocular pressures. *Id*. The plan was to encourage compliance with glaucoma medications (Latanoprost and Timolol), and recheck intraocular pressure every six months and automated visual fields annually. *Id*.

On May 20, 2022, Plaintiff asked the Idaho prison medical unit to create from his medical records a comprehensive analysis for his eye damage that occurred between 2020 and May 2022. Dkt. 74 at 5.

On August 19, 2022, Plaintiff had an optometry examination with prison optometrist Russell Gray. Plaintiff was advised to have his eye pressure checked every six months and return to Lifetime Optometry once a year for glaucoma specialty testing, and to continue taking his eye drops. Dkt. 75-1 at 7.

**MEMORANDUM DECISION AND ORDER - 19**

On September 8, 2022, he reported recurring "sun poisoning" symptoms. His request was triaged. Dkt. 74-3 at 24.

On September 12, 2022, Plaintiff consulted with an ENT specialist regarding chronic dizziness/vertigo; various recommendations were made. Dkt. 74-5 at 14.

On September 20, 2022, Plaintiff reported that he was dizzy, nauseous, and losing his balance; that meclizine was not working but was prescribed to him again; and that he would like a different medication instead. His request was triaged. Dkt. 74-3 at 25.

On May 5, 2023, the WHO's emergency committee on the COVID-19 pandemic recognized the end of the worldwide pandemic.[3]

On July 25, 2023, Plaintiff had another glaucoma exam by Dr. Murray at Lifetime Optometry. Dkt. 74-5 at 7. His *retina nerve fiber layer showed thinning; he had significant superior visual field loss*. *Id.* at 9. His prescriptions were continued indefinitely. He was advised to have a recheck every six months. Id. Dkt. 74-5 at 9.

On August 14, 2023, Plaintiff had a "normal ear exam," and it was recommended that he proceed with VNG testing and an audiogram, and that he have a consultation with a gastroenterologist regarding his reflux. Dkt. 74-5 at 25.

On August 21, 2023, Plaintiff had an office visit in which Dr. Jacob Majors removed cerumen from Plaintiff's ears. Dkt. 74-5 at 22.

---

[3] *See* https://www.who.int/news/item/05-05-2023-statement-on-the-fifteenth-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-coronavirus-disease-(covid-19)-pandemic?adgroupsurvey=%7Badgroupsurvey%7D%26gclid=EAIaIQobChMI4Ojtsdbe _gIVjQRyCh07igt4EAAYASACEgJ9pfD_BwE%26fbclid=IwAR2M8EAyiSrAodhK9p-X582nHkP2AigpSX8pYIsLsPwqYh4SG26RGokGe7E (accessed 2/17/2026).

**MEMORANDUM DECISION AND ORDER - 20**

On December 21, 2023, Plaintiff had another glaucoma exam by Dr. Murray at Lifetime Optometry. 74-7 at 5. His intraocular pressures were within normal limits. He had the same diagnosis and prescriptions, and admitted again to poor compliance; the doctor again discussed the possible ramifications of non-compliance and recommended checking eye pressure every six months. Dkt. 74-5 at 7.

On October 24, 2023, Plaintiff told the medical provider he had not been seen for dizziness. The medical provider informed him that he was not seen because he refused to see another provider for his visit. The medical provider educated him that he is not allowed to pick which provider to see, and discussed potential vestibular testing to help determine a cause of his dizziness. Dkt. 75-2 at 13.

On December 17, 2023, Plaintiff had a brain MRI at St. Luke's regarding his dizziness and blackouts. No acute intracranial abnormality was found. The report reflected the following: "Scattered small cerebral white matter lesions nonspecific, but common incidental finding in this age usually attributable to chronic small vessel disease." Dkt. 75-5 at 19.

On December 21, 2023, Plaintiff had a follow-up visit with a doctor at Lifetime Optometry. "*Superior visual field loss OU consistent with advancing glaucoma*" was found. Intraocular pressures were within normal limits. Dkt. 74-5 at 7. Plaintiff admitted to noncompliance with the medications. Dkt. 74-5 at 6.

On February 2, 2024, Plaintiff had a sick call visit with Chandra King. Plaintiff's vertigo condition was "referred to UM Team for review." Vestibular testing was

**MEMORANDUM DECISION AND ORDER - 21**

approved and scheduling started. Dkt. 74-7 at 2.

On February 26, 2024, Plaintiff had a sick call visit with Chandra King. He stated that his vertigo had increased, and he had used "PO medications, meclizine and Benadryl," and he stated that "he probably didn't give the meclizine time to work as he had only taken it a few times." Dkt. 74-6 at 2. King's notes stated: "reported chronic vertigo of unknown etiology; DDX of central vertigo vs. peripheral vertigo vs. Meniere's vs. Vestibular Neuronitis vs. BPPV." Dkt. 74-7 at 2.

On March 11, 2024, Plaintiff had a chronic care follow-up visit. The record shows that he "insisted that we need to continue with the 'prognosis' of his vertigo, that he had been seen by 7 providers and no one can say what is happening to him. He stated he needed his prescription meclizine to walk, but also reported it was too strong for him and that it affected him like Haldol. The provider was unable to assess him for vertigo because his gait was stable and normal entering and exiting the clinic, and his movements were smooth, and no symptoms were reported during the visit." Dkt. 74-3 at 17.

On March 21, 2024, Plaintiff went to sick call to discuss his vertigo. He reported meclizine was not helping reduce his dizziness and asked for it to be discontinued. Dkt. 74-7 at 4. Plaintiff reported, "NP Rogers with Centurion, ISCI, once said he believes there may be nothing anyone can do with me, and to deal with the damaged crystals." *Id*.

In March 2024, Plaintiff reported no recent vision changes, saying "I see black spot but was told that was glaucoma." Dkt. 74-8 at 14.

**MEMORANDUM DECISION AND ORDER - 22**

On May 7, 2024, Plaintiff had a glaucoma examination with optometrist Stephanie Warden. Dkt. 74-4 at 24; 74-5 at 3. Dr. Warden reported:

> Confirmed patient is currently instilling Timolol BID and ordered Latanoprost QHS OU as notated in previous consult records. *IOP slightly above average today and patient states no Timolol instilled prior to visit*….. Glasses updated and ordered.

Dkt. 74-5 at 3 (emphasis added). He was also diagnosed with "unspecified separation of retinal layers." *Id*. There is no cause or specific treatment noted in the medical record. Plaintiff also complained of dry eyes, and the optometrist ordered "AT gel" for him. *Id*.

In June 2024, Plaintiff saw Dr. Rebecca Ballard, who said that vertigo can be a chronic problem that is very difficult to treat with medication. She wrote, "Patient was satisfied with the understanding that he may have to live with it and there was not a good treatment for it." Dkt. 74-7 at 10.

### 3. Discussion

On the foregoing record, Plaintiff has not shown that Dolan had anything to do with Plaintiff's Idaho care. Due to no fault of anyone, Plaintiff's eye care was interrupted by the COVID-19 pandemic in 2020-2021. Plaintiff has not shown that Dolan acted in a deliberately indifferent manner that caused Plaintiff's superior visual field loss that was consistent with advancing glaucoma detected in 2022, 2023, and 2024. On this record, Plaintiff's visual loss could have been caused by the natural progression of glaucoma or Plaintiff's failure to use the eyedrops regularly, which is noted in his medical records in multiple years by different outside providers.

**MEMORANDUM DECISION AND ORDER - 23**

The fact that Plaintiff had a difficult-to-diagnose dizziness/vertigo/ blackout issue does not make the Idaho medical providers' care deliberately indifferent. Rather, the record shows that practitioners brainstormed different diagnoses, performed different tests to try to find a solution to his dizziness and blackouts (including an MRI), and offered different solutions, including medication and physical therapy. *See, e.g.*, Dkt. 75-2 at 6-7. No medical opinion in the record shows that any permanent injury resulted from the timing and manner of treatment for the ear problems that began in Texas (treatment was requested in October and provided in December), rather than from aging, the effect of a chronic buildup of cerumen (earwax), or a nonpreventable cause.

As to Plaintiff's other complaints of lack of care, the Idaho wrist and knee x-rays showed that no further treatment was indicated.

In fact, the lengthy record and the summary of Plaintiff's medical care set forth above shows that Plaintiff received constitutionally adequate care for his other medical conditions from January 2019 forward. All of Plaintiff's claims are subject to summary judgment, and this entire case will be dismissed with prejudice.

## ORDER

**IT IS ORDERED** that Defendant's second Motion for Summary Judgment (Dkt 113) is GRANTED for the reasons set forth above, and all claims are DISMISSED with prejudice. The Court will not entertain any further argument on any of these claims. Plaintiff may file a notice of appeal in this Court if he desires the Ninth Circuit Court of Appeals to review this case.

**MEMORANDUM DECISION AND ORDER - 24**

DATED: February 20, 2026

Honorable Debora K. Grasham
United States Magistrate Judge